Filed 9/4/15  Tricor Energy v. U.S. Full Service Energy CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TRICOR ENERGY, | |
| Plaintiff and Appellant, | G050703 |
| v. | (Super. Ct. No. 30-2014-00712239) |
| U.S. FULL SERVICE ENERGY, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Franz E. Miller, Judge.  Affirmed.

Thomas Whitelaw & Kolegraff, Joseph E. Thomas, William S. Sanderson; Snell & Wilmer, Richard A. Derevan and Todd E. Lundell for Plaintiff and Appellant.

Chadbourne & Parke, Robin D. Ball and Thomas J. McCormack for Defendant and Respondent.

Tricor Energy, LLC (Tricor) filed a petition to vacate an arbitration award entered in favor of U.S. Full Service Energy, L.L.C. (Full Service) following a nine-day hearing before arbitrator and retired Judge William F. McDonald. The arbitrator determined Tricor breached its fiduciary duty to Full Service with respect to a joint venture agreement between the parties. He awarded Full Service $8 million in compensatory damages plus attorney fees and costs. In this appeal, Tricor does not dispute the arbitrator's decision there was a breach, but asserts the measure of compensatory damages exceeded the arbitrator's powers. Tricor maintains the entire award must be vacated on this basis. We find no reason to disturb the arbitrator's equitable award and, therefore, we affirm the trial court's order confirming the arbitration award and its order denying the petition to vacate it.

I

Our summary of the facts is taken from the arbitration award and the respective petitions to confirm and vacate the arbitration award. As the parties recognize, courts may not review for the sufficiency of the evidence supporting an arbitrator's award. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 11 (*Moncharsh*).) We therefore take the arbitrator's findings as correct without examining a record of the arbitration hearings themselves; indeed, the appellate record contains neither a reporter's transcript of the hearings nor many of the exhibits introduced therein.

The arbitration award contains a concise summary of the dispute and the nature of the parties' joint venture agreement. The arbitrator wrote, "This sad tale starts as a promising joint venture between the parties. [¶] Tricor owned the surface and subsurface rights to a parcel of land near Bakersfield, California commonly referred to as the 'Ten Section' Hub. Ten Section [Hub] includes two subsurface zones with petroleum and natural gas storage potential, known as 'Zone 1' and 'Zone II.' Zone II is below Zone I. As of 2006, oil production had ceased from Zone I and Zone II was producing

2

between 250 to 300 barrels per day.  The natural gas storage potential had not been exploited.

"[Full Service] had been formed in 2004 by Chris Kunzi and his son Ryan Kunzi to service the energy industry.

"The parties were introduced to one another in 2006 by one of the Tricor owners, Majid Mojibi.  The parties agreed to jointly pursue the development of the natural gas storage potential of Ten Section [Hub].  The market for natural gas storage was very strong throughout the United States in 2006 and the parties felt Ten Section [Hub] was ideally situated to serve the western United States market.  The first agreement between the parties for this purpose was a letter agreement in 2006.  This was replaced by a formal Joint Venture Agreement dated December 2, 2008, effective October 1, 2008, Exhibit 7.  This is the [a]greement in issue in these proceedings.

"Pursuant to the agreements between the parties, Full Service began to actively market Ten Section [Hub] for [n]atural [g]as [s]torage.  This included obtaining the necessary government permits including [Federal Energy Regulatory Commission] FERC certification.  The parties also retained outside experts to evaluate the Ten [Section] Hub potential.  This included a feasibility study by International Gas Consulting ('IGC'), a recognized expert in the field.  Mr. Kranyak, an owner and executive of Tricor testified that IGC opined in 2008 the storage zone alone was worth $100 million unpermitted and $200 million plus or minus permitted.

"In April[] 2010, Inergy [Midstream (Inergy)], a publically traded master limited partnership pursuing a strategy of acquiring natural gas storage assets and developing natural gas storage assets, communicated an interest in Ten Section Hub.  Tricor management at the time viewed a relationship with Inergy a perfect fit.  Inergy made a number of offers culminating in a letter agreement proposal dated October 26, 2010, Exhibit 20.  This proposal called for a purchase price of $80 million in cash plus a 40 [percent] royalty on all crude production from Zone I and Zone II.  Tricor had Bank of

3

America Merrill Lynch (BAML) review the Ten [Section] Hub potential. BAML's presentation to Tricor, Exhibit 103, concluded this was a fair offer.

"The proposal was accepted by Tricor. The proposal by Inergy was subject to certain conditions being satisfied. [¶] An internal warfare between [Kranyak] and [Mojibi] created problems with compliance with the conditions. The testimony of each was frequently inconsistent with prior statements of each. As a result neither individual has much credibility. CACI 5003 says in part: '. . . if you decide that a witness deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.' That is the case here. The record and testimony of others must be utilized to determine the facts. The lack of credibility of these two witnesses impacts Tricor's ability to meet its burden of proof responsibilities. [¶] [Mojibi] did state in an e-mail to his partners that he intended to seek buyers for Tricor and that a sale of Ten Section Hub would complicate matters. [Mojibi] admitted in deposition testimony this was a bluff. Inergy expressed concerns about problems in a title report submitted to it by [a]ttorney Fred Sainick[, who] was attorney for Tricor and [Mojibi] as well as for [Mojibi's] companies. The conflicts of interest were patent but [Sainick] did nothing to withdraw from some of the representations.

"As joint venturers, both Tricor and Full Service had fiduciary obligations to the other. Each had responsibilities to the other in bringing the Inergy proposal to a successful conclusion. The title issues were perhaps the first hurdle. Although [Kranyak] had stated the title issues were resolvable and he could clarify them for Inergy, he does not seem to have made any effort to contact Inergy [to do so]. Instead he seemed to do nothing more than scream and shout about the problem and who was responsible for creating it.

"At this point Tricor had breached its fiduciary obligations to Full Service. It did nothing to cure the problem and made no effort to contact Inergy concerning Inergy's recitation of standard concerns starting with title, all of which appear resolvable

4

by Tricor.  At the time the natural gas storage market had not declined significantly.  The deal with Inergy, on the record presented at the [h]earing was very doable.  The future royalty payments were conjecturable but the $80 million cash up front was not conjecturable.  Accordingly, had Tricor performed, the [f]unding [e]vent described in the Joint Venture Agreement would have occurred and Full Service was entitle[d] to $8 million per the agreement.  This is the measure of damages for the breach by Tricor with respect to Inergy."

In the arbitration award, the arbitrator described a second failed business deal in 2012 to sell natural gas storage to TransCanada Corporation (TransCanada).  The arbitrator noted that although the natural gas storage market was declining in 2012, TransCanada's small purchase offer did "not seem to have been presented in good faith."  He concluded, "Under these circumstances, [t]he TransCanada debacle does not cure the breach by Tricor with respect to the Inergy proposal."

The arbitrator concluded Full Service was entitled to $8 million compensatory damages.  He reasoned that while there was "no question" Tricor breached its fiduciary obligations, there was insufficient evidence Tricor's conduct was fraudulent, warranting punitive damages.  The arbitrator wrote, "The record presented establishes the failures of Tricor were attributable to the unrelenting war between [Mojibi] and [Kranyak]" rather than fraud.

Finally, the arbitrator determined the Joint Venture Agreement provided the prevailing party would be entitled to costs, expenses, and attorney fees.  After considering briefing on this issue, the arbitrator concluded, "[t]he fee arrangement between Full Service and its counsel was complex [and] . . . [¶] to say the matter was hard fought is an understatement.  An award of attorney fees in the amount of [$4 million] is appropriate.  The costs in the amount of $602,229.07 are all well documented and reasonable."

Tricor petitioned to vacate the award. Full Service petitioned to confirm it. Tricor argued the arbitrator exceeded his powers by awarding damages based on assets not subject to the arbitration clause and not part of the joint venture. Specifically, Tricor maintained the Joint Venture Agreement provided Full Service with a 10 percent equity interest in the joint venture if there was a "Funding Event." Tricor argued it rightfully terminated the joint venture agreement because Full Service never found an investor. It recognized the Inergy deal would have qualified as a "Funding Event" and the arbitrator determined Tricor's breach of fiduciary duty caused the Inergy deal to fail. Nevertheless, Tricor maintains the court could not use the proposed outcome of the Inergy deal as a measure of damages.

Tricor explained Inergy offered $80 million to purchase two different types of assets. First, there were assets that were part of the joint venture, i.e., natural gas storage. Second, there were assets Tricor owned that were not part of the joint venture, such as the rights to Zone II oil production and a ground lease having a term exceeding 34 years. Tricor argued the arbitrator's award of $8 million represented 10 percent of the full $80 million purchase price for both categories of assets, and therefore, improperly included matters beyond the scope of the joint venture. In other words, Tricor believed Full Service was only entitled to 10 percent of the value of the joint venture's assets, which would be a sum less than $80 million. Tricor concludes the entire arbitration award must be vacated, not modified, due to this error.

In its petition to conform the arbitration award, Full Service noted it originally sought 10 percent of $133 million at the arbitration hearing, which was the value its expert gave to Inergy's cash and royalty offer. The arbitrator determined the future royalty payments were conjecture and based its award solely on the $80 million cash offer. Full Service argued Tricor was not entitled to second guess the arbitrator's choice of remedy. It also noted the Joint Venture Agreement did not limit Full Service's 10 percent interest to specified assets. Instead, the parties agreed Full Service would

6

receive a 10 percent interest in Tricor. Nothing in the agreement provided for a reduction of the promised 10 percent interest in the event Tricor elected to contribute additional assets for a successful "Funding Event."

The trial court denied the petition to vacate the arbitration award and granted the petition to confirm it. The court recognized an arbitrator exceeds his powers if he makes an award that is contrary to the terms of the arbitration agreement or the law. It summarized Tricor's argument as follows: "Tricor explains the arbitrator awarded damages of $8 [million] because although [Full Service] was entitled to 10 [percent] of the assets sold and the proposed contract for the sale of those assets was $80 million, some of the assets sold were not part of the joint venture between Tricor and [Full Service]. Tricor concludes the award . . . had to be less than $8 [million]. (There were also attorney fees awarded, but they are not at issue.)"

The trial court concluded the argument failed for two reasons. First, Tricor failed to show the agreement provided for payment of 10 percent of the assets sold. The agreement provided, "if part or all of a Tricor business entity was sold, [Full Service] would receive 10 percent of the sale price, not 10 [percent] of a particular asset. Thus, the arbitrator correctly determined [Full Service] was entitled to 10 [percent] of the $8 [million] sale price."

Second, the trial court reasoned that even if the agreement had limited damages to 10 percent of the assets sold, the award would merely be an error in calculating damages rather than an unauthorized remedy. The court noted the remedy was not expressly prohibited by the arbitration agreement, and no case authority has "overturned a remedy on facts similar to this one." The court concluded arbitrators must be given deference in fashioning remedies, and to critique the contract interpretation decision in this case would be contrary to that policy and our Supreme Court's decision in *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 372 (*AMD*).) As we will now explain, the trial court was right.

7

II

*A. Review of Arbitration Awards*

This case involves private, nonjudicial arbitration. In such cases, "'[t]he scope of arbitration is . . . a matter of agreement between the parties' [citation], and "'[t]he powers of an arbitrator are limited and circumscribed by the agreement or stipulation of submission.'" [Citations.]" (*Moncharsh, supra,* 3 Cal.4th at pp. 8-9.)

"'[A]rbitrators, unless specifically required to act in conformity with rules of law, may base their decision upon principles of justice and equity . . .' [Citations.]" (*Moncharsh, supra*, 3 Cal.4th at pp. 10-11.) "[C]ourts will not review the validity of the arbitrator's reasoning [citations]" or "the sufficiency of the evidence supporting an arbitrator's award. [Citations.]" (*Id*. at p. 11.) "'[T]he parties to an arbitral agreement knowingly take the risks of error of fact or law committed by the arbitrators . . . .' [Citation.] 'In other words, it is within the power of the arbitrator to make a mistake either legally or factually.'" (*Id*. at p. 12.) Consequently, "[A]n award reached by an arbitrator pursuant to a contractual agreement to arbitrate is not subject to judicial review except on the grounds set forth in [Code of Civil Procedure] sections 1286.2 (to vacate) and 1286.6 (for correction). Further, the existence of an error of law apparent on the face of the award that causes substantial injustice does not provide grounds for judicial review." (*Id*. at p. 33.)

One of the statutory grounds for vacating an arbitration award is that "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (Code Civ. Proc., § 1286.2, subd. (a)(4).) In determining whether the arbitrators exceeded their powers, courts must give "substantial deference to the arbitrators' own assessments of their contractual authority." (*AMD, supra,* 9 Cal.4th at p. 373.) A deferential standard is in keeping with the general rule of arbitral finality and ensures that judicial intervention in the process is minimized. (*Ibid*.) "A rule of judicial review under which courts would independently

8

redetermine the scope of an arbitration agreement already interpreted by the arbitrator would invite frequent and protracted judicial proceedings, contravening the parties' expectations of finality." (*Ibid*.)

"'Guided by these standards, this court conducts a de novo review, independently of the trial court, "'of the question whether the arbitrator exceeded the authority granted him by the parties' agreement to arbitrate. [Citations.]' [Citations.] In undertaking our review, however, 'we must draw every reasonable inference to support the award. [Citations.]' [Citation.] [¶] In short, we review the superior court's order de novo, while the arbitrator's award is entitled to deferential review. [Citation.]" (*Ajida Technologies, Inc. v. Roos Instruments, Inc.* (2001) 7 Cal.App.4th 534, 541.)

B. *Unauthorized Remedy*

In this case, Tricor argues the award must be vacated because the arbitrator exceeded his authority when it awarded damages that included the value of assets not part of the parties' joint venture agreement. In short, Tricor contends the award must be vacated because it contains a remedy unauthorized by the arbitration agreement.

Our assessment of Tricor's claim begins with this fundamental proposition: "The powers of an arbitrator derive from, and are limited by, the agreement to arbitrate." (*AMD, supra*, 9 Cal.4th at p. 375, citing *Moncharsh, supra*, 3 Cal.4th at p. 8.) Thus, in determining whether the arbitrator exceeded the scope of his powers here, we first look to the parties' agreement to see whether it placed any express limitations on the arbitrator's authority. For example, an arbitrator cannot award punitive damages if the arbitration agreement expressly prohibits such damages. With respect to this appeal the arbitrator's $8 million compensatory damage award would be unauthorized only if the parties expressly agreed to limit the scope of compensatory damages in the event of a dispute. They did not.

The parties' agreement contained a broadly worded arbitration clause in which the parties agreed to arbitrate "any dispute or controversy arising from or related to

9

this [a]greement]" We found no provision limiting the scope of remedies available. The parties did not limit the issues submitted to arbitration or limit the choice of remedies.

We note the parties' agreement incorporates the JAMS rules for arbitration. Those rules, attached to petition to confirm the arbitration award, also do not contain any specific limitation on the remedies available to the arbitrator. "The Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the [p]arties' agreement . . . ." In summary, there is no express limitation on the scope of compensatory damages to be awarded in arbitration. Nothing suggests the arbitrator was limited to awarding damages based solely on the value of the assets held by the joint venture as opposed to damages measured by the benefit of the bargain.

We recognize there is also case authority holding an arbitrator exceeds his or her authority if he or she awards damages having no "rational relationship to the contract and the breach." (*AMD, supra*, 9 Cal.4th at p. 381.) As previously stated, an arbitrator does not exceed his or her powers when he or she renders a decision that is based on errors of fact or law. (*Moncharsh, supra*, 3 Cal.4th at p. 11.) In a contract-based matter, this means that a court may not vacate an arbitration award merely because the court is unable to find specific terms in the contract authorizing the relief granted. (*AMD, supra*, 9 Cal.4th at p. 381.) On the contrary, as long as the arbitrator's final award bears "some rational relationship to the contract and the breach," a court will confirm the award. (*Ibid.*)

We conclude the $8 million compensatory damage award was rationally related to the terms of the contract and Tricor's breach. Full Service and Tricor entered into a joint venture agreement to develop and sell the natural gas storage potential of Ten Section Hub to a third party. Full Service promised to handle the licensing, development, and marketing efforts. Tricor agreed to contribute certain assets to a limited liability company created for the venture called Tricor Strategic Ventures (referred to by the

10

parties in the agreement and in the briefing as TSC) or contribute to TSC's wholly owned limited liability subsidiary, Tricor Energy Services. TSC was wholly owned by Tricor.

The agreement defined the "Funding Event" as occurring when a third party purchased between 40 to 100 percent interest in "Tricor Energy Services . . . or its assets on such terms and at such a price as Tricor and TSC deem acceptable." If the anticipated "Funding Event" occurred, Tricor promised to "cause Full Service to become a *10 [percent] owner of TSC*, which shall have become the sole member of Tricor Energy Services . . . ." (Italics added.)

The arbitrator interpreted these contract provisions as meaning Full Service would gain an unlimited 10 percent interest in TSC after a "Funding Event." He rejected Tricor's argument that the phrase "owner of TSC" meant merely the limited owner of the joint venture assets. And because the parties do not dispute the Inergy deal would have qualified as a "Funding Event" triggering Full Service's 10 percent interest, the arbitrator's remedy was clearly a calculation of the benefit of that bargain but for Tricor's breach. If the funding event had taken place, Full Service would be "a 10 percent owner of TSC" and, therefore, have a right to 10 percent of the $80 million payment to TSC (which is $8 million). "The basic object of damages is *compensation*, and in the law of contracts the theory is that the party injured by breach should receive as nearly as possible the equivalent of the benefits of performance." (1 Witkin, Summary 10th (2005) Contracts, § 869, p. 956.) The $8 million compensatory damage was rationally related to the contract and the breach.

Tricor argues there was no rational relationship because Full Service was only entitled under the agreement to receive a 10 percent equity interest in the sale of the joint venture's assets and the $80 million deal included the purchase of additional assets not related to the joint venture. It argues the arbitrator had "no rational basis to include as

11

part of the damage award the value" of those additional assets.[1]  This argument is based on a strained interpretation of the contract and one that was rejected by the arbitrator and the trial court.  We reach the same conclusion, but even if the arbitrator had made a mistake interpreting the contract, this type of error is not grounds to reverse the award.  "'[T]he parties to an arbitral agreement knowingly take the risks of error of fact or law committed by the arbitrators . . . .'  [Citation.]  'In other words, it is within the power of the arbitrator to make a mistake either legally or factually.'"  (*Moncharsh, supra*, 3 Cal.4th at p. 12.)

Tricor discusses the Supreme Court's *AMD* case at length to support its theory the arbitrator exceeded his powers.  We conclude the case hurts rather than helps Tricor.  In *AMD*, the trial court confirmed an arbitration award in a dispute between two microchip manufacturers, awarding a very broad remedy of permitting the winning party to use the losing party's intellectual property (a computer chip).  (*AMD, supra*, 9 Cal.4th at p. 367.)  The appellate court reversed, finding itself "unable to locate a 'rational nexus' between paragraphs . . . of the award and the contract itself.  Therefore, the court concluded, the arbitrator had improperly 'rewr[itten] the parties' agreement'" in paragraphs that could be treated as surplusage without affecting the merits of the

---

[1]        Tricor argues a "useful analogy is a contract to sell real estate."  It argues a homeowner is obligated to pay a real estate agent a commission if the home is sold, but is certainly not obligated to a commission if the homeowner also sells a RV, boat, or a second vacation home, "none of which was the subject of the listing agreement."  The simple sale of a home is not analogous to the complicated business deal at issue in this case.  A listing agreement may clearly offer a commission on the sale of a specific asset.  By contrast, this joint venture agreement offered Full Service partial ownership in a limited liability company without any limitations or conditions as to the assets held by that company.  In short, Full Service did not agree to be compensated for the sale of one asset but rather bargained for the benefits and rights associated with being partial owners of a limited liability company.  In addition, this case was arbitrated and an arbitrator has the authority to fashion any equitable relief rationally derived from the contract and award benefits different from those the party would have received through performance of the contract.  (*AMD, supra*, 9 Cal.4th at p. 381.)

decision. (*Id*. at p. 371.) The Supreme Court reversed the Court of Appeal, holding, "We distill from the[] cases what we believe is a meaningful, workable and properly deferential framework for reviewing an arbitrator's choice of remedies. Arbitrators are not obliged to read contracts literally, and an award may not be vacated merely because the court is unable to find the relief granted was authorized by a specific term of the contract. [Citation.] The remedy awarded, however, must bear some rational relationship to the contract and the breach. The required link may be to the contractual terms as actually interpreted by the arbitrator (if the arbitrator has made that interpretation known), to an interpretation implied in the award itself, or to a plausible theory of the contract's general subject matter, framework or intent. [Citation.] The award must be related in a rational manner to the breach (as expressly or impliedly found by the arbitrator). Where the damage is difficult to determine or measure, the arbitrator enjoys correspondingly broader discretion to fashion a remedy. [Citation.]" (*Id.* at p. 381, fn. omitted.)

The Supreme Court expressly rejected the argument that arbitrators "may not award a party benefits different from those the party could have acquired through performance of the contract." (*AMD, supra*, 9 Cal.4th at p. 382.) The court offered the following case examples, "In *Morris v. Zuckerman* [(1968)] 69 Cal.2d 686, for example, we held it within the arbitrator's power, as a remedy for the plaintiff's breach of fiduciary duties, to excuse the defendant from executing a document the parties' underlying contract required him to execute; the arbitrator properly created a condition to the required sale, although the original contract had no such limitation. [Citation.] Similarly, the union in *Local 120 v. Brooks Foundry, Inc.* [(1988)] 892 F.2d 1283, had no contractual right to a payment of $13,000, but the award was proper to alleviate the effects of the company's breach. In *Anderman/Smith Co. v. Tenn. Gas Pipeline Co.* [(1991)] 918 F.2d 1215, a dispute over the pricing of natural gas, the court approved an award requiring certain prices to remain in effect for one year and requiring any future

13

price changes to be approved by the arbitrators, although the contract contained different, comprehensive provisions for price changes. ([Citation]; see also *Engis Corp. v. Engis Ltd.* [(1992)] 800 F.Supp. [627,] 629-630 [arbitrator within powers in requiring one party to delete 'Engis' from its corporate name, even though contract specifically granted it right to use name]; *Hecla Min. Co. v. Bunker Hill Co.* [(1980)] 617 P.2d [861,] 870 [arbitrator could invalidate price schedule imposed by party while in breach although schedule was otherwise valid under contract]; *Malekzadeh v. Wyshock* [(1992)] 611 A.2d [18,] 22-23 [in dispute between general and limited partners, arbitrator could, as practical necessity, delegate managerial duties to independent third party, although contract assigned those duties to general partner].) [¶] As these examples demonstrate, arbitrators, unless expressly restricted by the agreement of the parties, enjoy the authority to fashion relief they consider just and fair under the circumstances existing at the time of arbitration, so long as the remedy may be rationally derived from the contract and the breach. The rights and obligations of the parties under the contract as it was to be performed are not an unfailing guide to the remedies available when the contract has been breached. It follows that parties entering into commercial contracts with arbitration clauses, if they wish the arbitrator's remedial authority to be specially restricted, would be well advised to set out such limitations explicitly and unambiguously in the arbitration clause. Because parties to arbitration agreements do have the power to limit possible remedies in this manner . . . we do not believe our holding will . . . discourage arbitration." (*Id.* at p. 383.)

In this case, the arbitrator explained in his award that the damage calculation was based on the evidence showing the Inergy deal was "very doable" but for Tricor's breach of fiduciary duty. In his award, the arbitrator cited to expert testimony the natural gas storage assets alone could be worth between $100 million unpermitted to over $200 million if permitted. He reasoned that if the Inergy deal had occurred, Full Service would have been entitled to $8 million. Aware the award should not include

14

unforeseeable damages, the court refused to include the portion of the Inergy deal promising the payment of future royalties.  It concluded this sum was too speculative.  However, the $80 million cash payment was not, and the damage award based on this figure was equitable and reasonably alleviated the effects of Tricor's breach of fiduciary duty.

As explained by the Supreme Court, "The choice of remedy, . . . may at times call on any decisionmaker's flexibility, creativity and sense of fairness.  In private arbitrations, the parties have bargained for the relatively free exercise of those faculties.  Arbitrators, unless specifically restricted by the agreement to following legal rules, "'may base their decision upon broad principles of justice and equity. . . ."  [Citations.] . . . Were courts to reevaluate independently the merits of a particular remedy, the parties' contractual expectation of a decision according to the arbitrators' best judgment would be defeated." (*AMD, supra*, 9 Cal.4th at pp. 374-375, fn. omitted.)

## III

The orders are affirmed.  Respondent shall recover its costs on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.


15