Filed 3/27/26  P. v. Lopez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GERALD LOPEZ,<br><br>Defendant and Appellant. | D085194<br><br>(Super. Ct. No. SCE413531) |

APPEAL from a judgment of the Superior Court of San Diego County, John M. Thompson, Judge.  Reversed and remanded.

George L. Schraer for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Gerald Lopez, a high school teacher in his 50s, began an indecent relationship with a female student the summer before she turned 17 and

started her senior year. Over the next year, before she turned 18, their relationship progressed to physical touching and an exchange of over 8,000 text messages, many sexually charged and accompanied by suggestive photographs the student took of herself and sent to Lopez.

The San Diego County District Attorney's Office prosecuted Lopez with 26 counts that included sending harmful matter to a minor with the intent of seduction (Pen. Code,[1] § 288.2, subd. (a)), contacting a minor with the intent to commit a sexual offense (§ 288.3, subd. (a)), arranging an illicit meeting with a minor (§ 288.4, subd. (b)), misdemeanor child molestation (§ 647.6, subd. (a)(1)), and possession of child pornography (§ 311.11, subd. (a)). A jury convicted Lopez on the possession of child pornography count and the misdemeanor child molestation count, but acquitted him of the remaining 18 counts and hung on five counts which were then dismissed. During trial, the prosecution dismissed one count.

On appeal, Lopez asserts the evidence was insufficient to support either of his convictions, and he was denied a fair trial or alternatively the trial court erred in denying his mistrial motion. For reasons we shall explain, we must reverse the judgment.

We agree there is insufficient evidence to support the child pornography count. The photograph on which it relies does not depict a minor "personally engaging in or simulating *sexual conduct*," as defined in section 311.4, subdivision (d). (§ 311.11, subd. (a)(1), italics added.) However, substantial evidence supported his conviction on the child molestation count.

---

[1]     Further unspecified statutory references are to the Penal Code.

On his due process claim, the trial court allowed the prosecution over the span of four days, and defense objection, to elicit testimony from the victim on how Lopez's words, actions, and text messages made her feel, which (in the court's words) tended to portray her as naïve with older men. The court then precluded the defense from introducing evidence during cross-examination of the victim that (in the court's words) painted "absolutely [the] opposite" persona. It later ruled that it had erred and in hindsight all testimony in this area was irrelevant and inadmissible. Rather than allow the defense to rebut the evidence already before the jury or declare a mistrial, the court instructed the jury that it was striking "that portion of [the victim's] testimony *over the last four days*" as to her feelings in response to Lopez's "actions," "statements" and text messages. (Italics added.)

Despite the trial court's best intentions, we conclude that the magnitude of the court's evidentiary error was prejudicial to Lopez and the court's curative instruction to the jury to simply disregard irrelevant testimony over the span of four days without pinpointing what specifically fell within the strike zone was inadequate to remedy the prejudice. The instruction was so broad and vague that it failed to provide any meaningful guidance to the factfinder, such that the prosecutor in closing argument, and even the Attorney General in his respondent's brief on appeal, relied on testimony that arguably was stricken from the record. On this record, we conclude the defendant was denied a fair trial. Because we find sufficient evidence supported the misdemeanor count for child molestation, the People are not precluded from retrying Lopez on that count. The judgment is reversed and remanded for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Charges, Jury Verdicts, & Sentencing*

As noted, Lopez was charged with 26 counts: seven counts of sending harmful matter to a minor, Jane Doe, with the intent of seduction (§ 288.2, subd. (a); counts 1–5, 10, 11); 16 counts of contacting a minor with the intent to commit a sexual offense (§ 288.3, subd. (a); counts 6–9, 12–17, 19–24); and one count each of arranging an illicit meeting with a minor (§ 288.4, subd. (b); count 18), child molestation (§ 647.6, subd. (a)(1); count 25), and possession of child pornography (§ 311.11, subd. (a); count 26). All were felonies, except for count 25.

The jury convicted Lopez of two counts—count 25 for misdemeanor child molestation and count 26 for possession of child pornography—and acquitted him of counts 5 through 9, and 12 through 24. During trial, the prosecution dismissed count 10. The jury was unable to reach verdicts on counts 1 through 4, and 11. After the trial court declared a mistrial as to those counts, they were dismissed on the prosecution's motion.

At sentencing, the trial court placed Lopez on two years of formal probation and ordered him to serve 180 days in jail but stayed the custodial time pending appeal.

II.

*Trial*

The 26 counts charged were alleged to have occurred between March 14 and June 12, 2022. On these dates, Jane was 17 years old (she turned 18 in September 2022), and Lopez was 53 to 54 years old.

4

A.    *Prosecution's Case*

In 2021, before she started her senior year, Jane enrolled in a summer school English class taught by Lopez. She enjoyed Lopez's class. He was considered a fun teacher and told his students he wanted to treat them like adults. That made Jane feel "older and cooler," she was not being "treated like a kid." He allowed students to use their cell phones during class and keep their snacks in his refrigerator. Students would gather in Lopez's classroom during school breaks. He gave out his Snapchat account to many students, mostly girls, including Jane.

During the six-week summer course, Jane was assigned to write in a personal journal. Lopez would read what she wrote and provide feedback and "advice," including on "problems" she had. His feedback made Jane feel "[l]ike he actually cared, because he actually read what [she] wrote."[2] As time went on with her journaling assignment, Jane felt she could open up more to Lopez. During class, Jane also caught Lopez staring at her body, including her legs and buttocks. According to Jane, the two "got really close over summer school." Jane was a few months shy of 17. Lopez was 53 years old.

Jane turned 17 years old in the fall when she started her senior year. Although she did not have Lopez as a teacher that semester, she went to Lopez's classroom every day before school and during breaks. Lopez was

---

[2]    As we will discuss, the trial court later struck and instructed the jury to disregard all testimony by Jane about how she felt in response to Lopez's actions, statements, and text messages, on both direct and cross examination. The prosecution, however, relied on the stricken testimony in closing arguments in support of its view that Lopez "groomed" Jane. Here, we include such testimony to summarize the evidence as it was presented to the jury by the People in closing arguments.

especially nice to Jane. He stocked his refrigerator with her favorite snacks and energy drinks. He wrote passes so Jane could skip class and eventually allowed her to write her own passes. He also let her use his key to access his classroom and the staff bathroom. All this made Jane feel closer to Lopez because "it was kind of something that just [they] knew about."

Lopez's habit of staring at Jane's body also continued. He began complimenting her, often telling her she was "really cute," "really hot," or "pretty." He told her she had "really nice legs." By the end of that first semester, Jane felt she had grown closer to Lopez and their relationship had "[e]volved." She felt "a closeness that was a little bit more than friends." They began "flirting" with one another.

When the second semester began in 2022, Jane became Lopez's teaching assistant for his criminal justice class. At Lopez's urging, Jane also joined the powder puff football team that he coached. He later picked her to be the team captain. Their connection grew and their flirtation "increased and intensified." Lopez often gave Jane words of encouragement. He told her things like she "ha[d] power," she was "born with power and intellect," and she was a "fierce woman warrior." He assured her that he was a safe person in whom she could confide.

Lopez continued to comment about Jane's body, and they began to engage in some physical touching. During class, Jane massaged Lopez's head and shoulders in front of other students. When she sat behind him in class, he twiddled his fingers on her leg and rubbed her leg. Over time, he started rubbing closer to her crotch. There were times when they each touched the other's buttocks in the classroom when nobody else was around. At one school event, she sat on his knee while he massaged her foot. One classmate

thought the interactions between Lopez and Jane were inappropriate and reported them to another teacher.

Lopez and Jane initially communicated through Snapchat, but he later gave her his personal cell phone number. Over the course of the second semester, Lopez and Jane exchanged many flirtatious and sexually charged texts. Jane sent Lopez sexually suggestive photographs of herself, both by texting them to him directly and by saving them to a shared Google album. She was never completely naked in the photographs. In total, the prosecution introduced evidence of 8,323 text messages and 931 photos and videos.[3]

By May 2022, Jane believed she had romantic feelings for Lopez. He often told her they had to wait until she turned 18 years old in September 2022 and noted how many days they had left until her birthday. Periodically, he told her things like he "need[ed] to chill [himself] out" and that she should stop sending him photographs.

Near the end of May 2022, Lopez smacked Jane on the buttocks after school, when nobody was around, and then texted her, "I've waited to do that for a while." On two occasions, Lopez drove Jane home from school events, and they held hands. By the end of that month, Jane believed she was in love with Lopez.

Jane graduated during the first week of June 2022, about three months before she turned 18. On graduation day, Lopez gave her a ride in his car. They parked in a church parking lot across from Jane's house, and he lifted her dress and touched her buttocks with both hands. A few days later, Lopez

---

[3] These photos and videos exchanged between Jane and Lopez were not all of a sexual nature.

told Jane to take a break and focus on her future and what she wanted in life, and they could talk about things if she felt the same way after her 18th birthday. He told her that they needed to "dial[ ] the flirting down."

A week later, Jane went to her friend's graduation party at the beach. While there, Jane's friends noticed she was constantly texting on her phone. They asked her who she was texting, and she responded that it was "her man" and "her DILF."[4] She told them he was a 54-year-old man, a teacher, and her "sugar daddy." When Jane told her friends that a family member was going to pick her up from the beach party, they were suspicious. She then admitted the man she had been texting was going to pick her up. Later, other friends saw Lopez pick Jane up from the beach.

Lopez drove Jane to the same church parking lot they had visited on her graduation day. While seated in the passenger seat, Jane placed her feet in Lopez's lap, and he rubbed them. From that position, she reached into the back seat area and he put his hands down the back of her sweatpants and squeezed her buttocks. She moved to sit on top of him and he kissed her. He then kissed her neck and breasts while she wore a bathing suit top. He told her that "he wanted to taste [her]," which she understood meant oral sex.[5]

One of Jane's friends tracked her location after Lopez picked her up from the beach. When the friend saw Jane was at the church, he called and texted her to tell her to go home. He even told her that he had notified her mother. The friend's calls and texts caused Jane to stop the sexual encounter with Lopez. Lopez then drove Jane home. Before she got out of his car,

---

[4] "[D]ad I'd like or love to fuck."

[5] This encounter in Lopez's car before Jane turned 18 years old is the subject of count 25 for child molestation.

Lopez told her, "I wanted to taste you from the front and the back." She understood him to mean oral sex.

Two days after the beach party, Jane's mother learned Lopez had picked Jane up from the beach. Jane's mother accessed Jane's smart watch and saw some of the photographs she sent to Lopez. Jane's mother took Jane's phone and Jane's aunt called Lopez from it. When Lopez answered, he repeatedly apologized and told Jane's aunt that he had been trying to slow them down until Jane turned 18 years old. The next morning, Jane's mother reported their relationship to the school.

During police interviews, Jane reported that Lopez kissed her, licked chocolate from above her breast, and touched her buttocks when they were in the car at the church parking lot after the beach party. He did not touch her vagina or breasts. In a forensic search of Jane's cell phone, police found a photograph from June 8, 2022 of Jane sitting on a bathroom counter wearing only thong underwear with the contour of one breast visible behind her hand and arm.[6]

B.  *Defense Case*

Clark Clipson, a forensic psychologist, assessed Lopez's psychosexual functioning, potential psychiatric diagnoses, and motivation for his relationship with Jane. Clipson testified Lopez possesses average to above average intelligence and has no brain dysfunction. Lopez exhibits chronic symptoms of depression, which he does not acknowledge or manage well. Lopez has low self-esteem, is insecure, needs to please others, and looks for acceptance. As for sexual interest, Clipson found Lopez "demonstrated a very

---

[6]  This is the photograph that is the subject of count 26 for possession of child pornography.

expected profile that would be consistent with that of a heterosexual male who is primarily sexually attracted to adult females ranging in age from 20 to 60." Lopez also "show[ed] a mild sexual interest in older adolescents," which in Clipson's view, "is completely normal and which you would expect to find in any normal heterosexual male." Lopez did not exhibit signs of pedophilia. Clipson opined that Lopez "is below average risk to commit a future sexual offense." None of Lopez's test results suggested he "has an abnormal or unnatural sexual interest in children." The defense did not present any other witnesses.

## DISCUSSION

## I.

### *Possession of Child Pornography*

Lopez contends his conviction for possession of child pornography must be reversed because the photograph does not depict Jane engaging in or simulating any act that is defined as "sexual conduct" by the applicable statutes. We agree.[7]

At the time of Lopez's trial, former section 311.11, subdivision (a), provided:[8] "Every person who knowingly possesses or controls any . . . image

---

[7] Lopez advances two other reasons he believes mandate reversal: the photograph also does not depict Jane engaging in " 'conduct [that] is intended or designed to elicit a sexual response in the viewer' " and, because Jane took the photograph of herself and sent it to Lopez, it is "outside of the type of conduct that section 311.11 was designed to punish." We reject these reasons.

[8] Effective January 1, 2025, section 311.11, subdivision (a) was amended to include two subsections. The text of section 311.11, subdivision (a) in effect at the time of Lopez's trial is now subdivision (a)(1), while subdivision (a)(2) relates to images that "depict[ ] what appear[ ] to be . . . person[s] under 18 years of age, or contain[ ] digitally altered or artificial-intelligence-

. . . , the production of which involves the use of a person under 18 years of age, knowing that the matter depicts a person under 18 years of age personally engaging in or simulating *sexual conduct*, as defined in subdivision (d) of [s]ection 311.4, is guilty of a felony." (Italics added.)

Section 311.4 defines " 'sexual conduct' " to mean "any of the following, whether actual or simulated: sexual intercourse, oral copulation, anal intercourse, anal oral copulation, masturbation, bestiality, sexual sadism, sexual masochism, penetration of the vagina or rectum by any object in a lewd or lascivious manner, *exhibition of the genitals or pubic or rectal area* for the purpose of sexual stimulation of the viewer, any lewd or lascivious sexual act as defined in [s]ection 288, or excretory functions performed in a lewd or lascivious manner, whether or not any of the above conduct is performed alone or between members of the same or opposite sex or between humans and animals. An act is simulated when it gives the appearance of being sexual conduct." (§ 311.4, subd. (d), italics added.)

Lopez's conviction in count 26 for possession of child pornography was based on a photograph Jane took of herself on or about June 8, 2022.[9] The

_____

generated data depicting what appear[ ] to be . . . person[s] under 18 years of age."

[9] In the verdict form on count 26, the jury unanimously agreed the photograph they identified as "June 8th 2022/11:24:52/B6DDD/1231.jpg (topless sitting on counter)" was "the matter possessed in violation of . . . Penal Code section 311.11[, subd.] (a)." Both parties identified this photograph as contained in Exhibit 27 (a CD) and 27A (a thumb drive). Exhibit 27 and Exhibit 27A were transmitted to this court as part of the record on appeal. In our record, the file name for the June 8, 2022 photograph is 61_01_5D9626E9-8ED4-4ADB-8BAF-1D1E8008DEF0_67614881365_0B83A66D-4468-4DBD-BF17-662DF633A00F5 c~1.

photograph depicts Jane, topless and wearing only a thong underwear, taking a photograph of herself in the reflection of a bathroom mirror. She is partially seated on the edge of the bathroom counter, with one leg (from buttock to knee) resting on the counter. She appears to be supporting herself on her opposite leg, although this leg is hidden from view, and the contour of the buttock on this side is partially visible. The cleft of her buttocks is not exposed. Her torso is rotated toward the mirror, with one hand holding the phone up in front of her face to take the photograph. In this position, her other hand is resting on one breast such that the side contour of the breast is visible while the areola and nipple are hidden.[10]

The photograph does not depict Jane engaging in or simulating any of the explicit sex acts listed in section 311.4, subdivision (d). The People do not contend otherwise. Nor do the People contend the photograph depicts

---

[10] The parties' descriptions of what the photograph depicts are consistent. Lopez describes the photograph as a " 'selfie' " depicting Jane "sitting on what looks like a bathroom sink. It appears [she] is taking a photograph of a mirror that reflects the photograph's contents. The image in the photo shows [Jane] from the left side. She is wearing thong underwear. Her left hand appears to be holding a phone in front of and covering roughly the entire left side of her face. She is topless, but her right hand is covering much of her left breast, including the nipple." According to the People, the photograph "shows [Jane] wearing only a thong, in the bathroom taking a photo of her reflection in a mirror. She is partially seated on the bathroom counter so that both of her butt cheeks are visible, and her torso is twisted toward the mirror so that one breast and her face are pointing at the mirror (though her face is covered by her cell phone). One hand is holding the phone up to take the photo; the other hand is being used to cover her nipple."

exhibition of Jane's genitalia or pubic area.[11]  And exhibition of the breasts is not included in the statutory definition of " 'sexual conduct.' "  (§ 311.4, subd. (d); see *People v. Wallace* (1992) 11 Cal.App.4th 568, 582 [exposure of breasts "d[oes] not constitute the prohibited exhibition under section 311.4"], disapproved on another ground in *People v. Martinez* (1995) 11 Cal.4th 434, 452.)  Rather, the parties' dispute centers solely on whether the photograph depicts exhibition of Jane's "rectal area."

The parties have identified one decision addressing the meaning of "rectal area" as used in section 311.4.  In *People v. Cantrell* (1992) 7 Cal.App.4th 523 (*Cantrell*), the defendant was convicted of employing or using a minor under the age of 17 years to pose for photographs " 'involving sexual conduct,' " in violation of section 311.4, subdivision (c).  (*Cantrell,* at p. 539.)  Like the child pornography possession statute at issue here, section 311.4, subdivision (c), incorporates the same definition of " 'sexual conduct' " found in section 311.4, subdivision (d).  (*Cantrell*, at p. 539.)  The instructions to the jury specifically designated the sexual conduct at issue in the case as " 'exhibition of the genitals, pubic or rectal area for sexual simulation of the viewer or any lewd or lascivious act as defined in [s]ection 288(a).' "  (*Id.* at p. 540.)  The defendant argued the trial court prejudicially erred by failing to instruct the jury on the meaning of the term " 'rectal area' " as used in section 311.4, and noted there was confusion because "counsel from both sides

_____

[11]  At oral argument, the People argued, for the first time, that the photograph satisfied section 311.4, subdivision (d), because it also depicted Jane's pubic area.  This belated argument is forfeited.  (*People v. Reyes* (2016) 246 Cal.App.4th 62, 81 fn. 6 [argument presented for first time at oral argument is forfeited].)  We also reject it on the merits.  There is no interpretation of the photograph, given the position in which Jane is sitting, that her pubic area is exposed.

debated in closing argument whether or not the 'rectal area' includes the buttocks." (*Cantrell*, at p. 543.)

In rejecting the instructional error claim, the First Appellate District found the term "rectal area," as used in section 311.4, is not "a technical one requiring special instruction" but are "words . . . used in their ordinary sense." (*Cantrell*, *supra*, 7 Cal.App.4th at p. 544.)  Instead, it presumed "most people are familiar with basic anatomical terms such as 'rectum' and 'buttocks.'  While they might not be able to define them in exact, scientific language, they can describe them in terms of function and location.  Such is all that is required for purposes of construing the statute." (*Ibid.*)

The defendant in *Cantrell*, however, conflated the term " 'rectal area' " with " 'rectum' itself" and argued the former "does not include the 'buttocks.' " (*Cantrell*, *supra*, 7 Cal.App.4th at pp. 544–545.)  Rejecting *that* argument, the court offered these clarifications.  "As previously established, 'rectal area' is the exterior area of the body near the rectum or anus." (*Id.* at p. 545.)  Then referring to the dictionary definitions, the court explained " [r]ectal' " means " 'of, relating to, affecting or located near the rectum' " (*id.* at p. 544), whereas " 'buttock' " is " 'either of the two rounded prominences separated by a median cleft that form the lower part of the back in [a hu]man . . . [;] the lower part of the back made up of these prominences[;] seat' " (*id.* at p. 545).  Thus, as both terms are defined, the court reasoned " 'rectal area' would necessarily encompass part of the seat of the body or what might be termed the lower part of the buttocks." (*Ibid.*)

Relying on this last statement in *Cantrell*, the People argue a reasonable jury could find the subject photograph showed an exhibition of Jane's rectal area because it encompassed " 'part of the seat of the body or what might be termed the lower part of the buttocks.' "  We cannot agree.  As

14

*Cantrell* emphasized, the " 'rectal area,' " as used in section 311.4, subdivision (d), is not equivalent to " 'buttocks' " and, to the extent " 'rectal area' " may include any portion of the buttocks, it is limited to a portion of the lower buttocks "near the rectum or anus." (*Cantrell, supra,* 7 Cal.App.4th at p. 545.) The photograph of Jane does not reveal the seat of her buttocks, nor any portion of her lower buttocks near her rectum or anus. In fact, Jane is *sitting on her buttocks,* which obstructs any area near the rectum or anus from view.

There is another problem with the People's argument that a reasonable jury could find an exhibition of Jane's rectal area in the photograph. The jury was never instructed on this theory for the possession of child pornography count.[12] The trial court instructed the jury on count 26 with a modified

_____

[12] At oral argument, the People argued the jury was properly instructed on the statutory definition of "sexual conduct" because the trial court provided further instruction with the definition in response to a jury note. During deliberations, the jury asked the court for a definition of "sexual conduct" as it related to the "harmful material" element of counts one through five and 11, which charged Lopez with sending harmful matter to a minor with the intent of seduction under section 288.2, subdivision (a). The jury specifically highlighted that the instruction on these charges under CALCRIM No. 1140 did not include a definition of "sexual conduct."

In response, the court provided the jury with this instruction: "Sexual Conduct – Defined [¶] 'Sexual conduct' is defined as actual or simulated sexual intercourse, oral copulation, anal intercourse, anal oral copulation, masturbation, bestiality, sexual sadism, sexual masochism, penetration of the vagina or rectum by any object in a lewd or lascivious manner, exhibition of the genitals or pubic or rectal area for the purpose of sexual stimulation of the viewer, or excretory functions performed in a lewd or lascivious manner, whether or not any of the above conduct is performed alone or between members of the same or opposite sex or between humans and animals. An act is simulated when it gives the appearance of being sexual conduct."

CALCRIM No. 1145 that included the following definition of sexual conduct: "*Sexual conduct* means actual or simulated (sexual intercourse/ [or] oral copulation[,]/ [or] anal intercourse[,]/ [or] anal oral copulation[,]/ [or] _____ <*insert other sexual conduct as defined in Pen. Code, § 311.4(d)(1)*>). An act is simulated when it gives the appearance of being sexual conduct." In the blank space where the instruction prompts to "*insert other sexual conduct as defined in*" section 311.4, subdivision (d)(1), the handwritten text "sexual conduct as described hereafter" was added by interlineation. The "hereafter" then instructed the jury to consider six factors, known as the *Kongs* factors,[13]

---

Nothing in the trial court's response to the jury's note instructed the jury that it was to apply this definition to the charge in count 26 for possession of child pornography under section 311.11, subdivision (a). In fact, as we will explain, with respect to count 26 the court gave the jury the definition of "sexual conduct" to be applied under section 311.11, subdivision (a) and that definition did not include the rectal area requirement.

[13] The *Kongs* factors are not included in the standard CALCRIM No. 1145 instruction. The factors are derived from *People v. Kongs* (1994) 30 Cal.App.4th 1741, 1753–1755, where the Court of Appeal applied a list of six factors adopted by the federal courts for a trier of fact to consider "when determining what constitutes a 'lascivious exhibition of the genitals or pubic area' " (*id.* at p. 1754) in assessing a sufficiency of the evidence claim under section 311.4 (using a minor to pose for sex acts) and section 311.11, subdivision (a) (possession of child pornography). The six factors are: (1) whether the image focuses "on the child's genitalia or pubic area"; (2) whether the image was taken in a place or depicts a pose "generally associated with sexual activity"; (3) whether the child is posed unnaturally or dressed inappropriately for the child's age; (4) "whether the child is fully or partially clothed, or nude"; (5) "whether the child's conduct suggests sexual coyness or a willingness to engage in sexual activity"; and (6) "whether the conduct is intended or designed to elicit a sexual response in the viewer." (*Kongs*, at p. 1755.)

The parties devote significant argument to whether the *Kongs* factors are met in this case. Assuming they are applicable here, we need not reach this issue because we find as a matter of law that the subject photograph

16

in determining "whether the matter is sexual conduct."  Nowhere in the instruction, including the *Kongs* factors, was the jury instructed that "sexual conduct" under section 311.11, subdivision (a), meant "exhibition of the . . . rectal area for the purpose of sexual stimulation of the viewer."  (§ 311.4, subd. (d).)  Thus, contrary to the People's claim, the jury could not have reasonably found a violation of section 311.11 based on its belated theory the photograph of Jane depicted the rectal area as statutorily defined.[14]

For all these reasons, we conclude no reasonable jury could determine, based on the overall content of the photograph, that it depicts an exhibition of the rectal area for the viewer's sexual stimulation.  (*See People v. Spurlock* (2003) 114 Cal.App.4th 1122, 1133.)  We thus conclude the subject photograph does not, as a matter of law, depict Jane engaging in or simulating sexual conduct.  Consequently, the evidence was insufficient to support Lopez's conviction for possession of child pornography in count 26.  The Double Jeopardy Clause bars retrial on this charge.  (*People v. Hin* (2025) 17 Cal.5th 401, 468.)

## II.

### *Due Process*

Lopez also contends the prosecution's presentation of Jane's irrelevant and prejudicial testimony explaining how Lopez's statements and actions

---

does not satisfy the threshold statutory element requiring the exhibition of Jane's rectal area.  (§ 311.4, subd. (d).)

14    Lopez has not presented on appeal a claim of instructional error and, thus, he has forfeited any such claim.  (*People v. Battle* (2011) 198 Cal.App.4th 50, 76 (*Battle*).)  However, we discuss the instruction in light of the People's argument that the jury here could reasonably have found the subject photograph satisfied the statutory definition of "sexual conduct" based on exhibition of the "rectal area."

17

made her feel, combined with the trial court's denial of the defense's request to admit rebuttal evidence about Jane's contact with other older men, resulted in such fundamental unfairness as to violate due process. We agree.[15]

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439; *Estelle v. McGuire* (1991) 502 U.S. 62, 70.) " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." ' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229 (*Albarran*).)

At trial, the prosecutor extensively questioned Jane about how Lopez made her feel through his statements and actions. Lopez's defense counsel objected to the prosecutor's line of questioning on relevance grounds, but the trial court overruled the objection, finding the testimony relevant to Jane's credibility.[16] As a result, over the course of four days, Jane was permitted to

---

[15] Lopez further contends that the trial court erred by denying the defense's related mistrial motion. Because we find the judgment must be reversed on due process grounds, we do not address the trial court's ruling on the mistrial motion.

[16] On the first day and into the second day of Jane's testimony, the defense objected to the questioning as leading, calling for speculation, and being asked and answered. Into the second day of Jane's testimony, the defense began to object on relevance grounds. Ordinarily, a party's failure to object to certain testimony at all, or failure to object on the specific grounds asserted on appeal, would render a challenge to the admission of the testimony forfeited. (*People v. Oyler* (2025) 17 Cal.5th 756, 831.) Here, Lopez's failure to object before the second day of Jane's testimony is of no moment because the trial court ordered stricken *all* of Jane's testimony, over the entire four days she was on the stand, about how Lopez's words and

testify on direct examination that Lopez's encouraging words made her feel seen, cared for, appreciated, and "like [she] had some sort of meaning." Their flirtatious and sexual interactions made her feel special, sexy, and pretty. She stated that his treatment of her made her feel "good" and "better about [herself]." According to Jane, when Lopez texted that he loved her, she found it "kind of confusing" but it made her feel good because "[i]t showed that he cared about [her]." Jane also indicated that, as of the time of trial, her feelings had changed, testifying she "hate[d]" the interactions she had with Lopez because without them she "would have somewhat of a normal life."

To counter Jane's direct testimony, Lopez's counsel sought to cross-examine her about text messages she exchanged with other older men during her senior year of high school. Counsel detailed for the trial court the types of messages Jane had exchanged with these other men, describing the messages as "sexting," and explained he sought to question Jane about the messages to dispel the image the prosecutor painted of her as a naïve girl who Lopez groomed. The trial court agreed that "[t]he persona that's being portrayed here over the last [four] days is absolutely opposite of what is reflected in all of these text messages. It's blatantly obvious to me. And it certainly is going to be obvious to [the jury]." Based on the evidence proffered by the defense, the court concluded "[t]his is not some 17-year-old little girl who had never had any experience with older men." Nevertheless, the court questioned whether the proffered defense evidence was relevant to the charges against Lopez.

---

actions made her feel. It is that evidentiary ruling at issue here. To the extent the People might dispute whether the trial court struck even the portions of Jane's testimony to which the defense did not lodge a relevancy objection, this merely serves to demonstrate that the trial court's limiting instruction was overbroad and unclear, as we will discuss later.

Ultimately, the trial court explained that, in hindsight, Jane's direct testimony about how Lopez made her feel was inadmissible because "[w]hat she feels about a text or how she feels about the actions of [Lopez] is not relevant to any charge. How she interprets a text and what she thinks it means is not relevant to any charge. It is how the trier of fact interprets the texts[ a]nd the actions of [Lopez] in determining if he did or did not have the requisite intent to commit the charged crimes." The court conceded it "should have sustained the objection [to Jane's direct testimony] when it was first made" by the defense. But the court found that any evidence the defense might present to counter this irrelevant testimony was also irrelevant and inadmissible. For this reason, the court denied the defense request to admit evidence of Jane's communications with other men and purported to strike the offending portions of Jane's direct testimony. The court then instructed the jury, as follows:

> "The Court will strike and you are to disregard that portion of [Jane's] testimony over the last four days as to her feelings or how she felt as a result of texts or of the Defendant's statements or the Defendant's actions, whether they would be in the classroom, in a public, or private setting."

> "The Court will strike and you are to disregard that portion of [Jane's] testimony with regard to interpretation or understanding as to the meaning of texts in whole or in part -- texts she sent or texts she received. It is not [Jane's] understanding, feelings, or interpretations that are relevant to the case. It is the Defendant's intent or lack of intent that you will be called upon to decide -- his intent or lack of intent as to the texts or messages he sent, statements he made, or actions he engaged in."

20

The parties do not contend there are permissible inferences the jury may have drawn from Jane's testimony about how Lopez made her feel.[17] The issue for us to decide, then, is whether Jane's inadmissible testimony is of such quality that its presentation to the jury necessarily prevented a fair trial as guaranteed by the Due Process Clause, particularly when viewed under the circumstances in which it was presented here. (*Albarran, supra*, 149 Cal.App.4th at p. 229.)

Although distinguishable on some points, *Albarran, supra*, 149 Cal.App.4th 214 is instructive. In *Albarran*, the defendant was tried on multiple charges and allegations, including gang enhancement allegations. (*Id.* at p. 219.) To prove the gang enhancement allegations, the prosecution presented at trial evidence that the underlying crimes were gang related. (*Id.* at pp. 219–221.) After he was convicted, Albarran moved for a new trial, arguing the evidence presented at his trial was insufficient to support the gang enhancement allegations and that a new trial was warranted on the remaining charges because the gang evidence that was admitted was relevant only to the gang enhancements. (*Id.* at p. 222.) The trial court granted the motion as to the gang enhancements but denied the motion as to the remaining charges. (*Ibid.*)

On appeal, Albarran asserted the gang evidence presented at trial was relevant only to the gang enhancements, which were later dismissed, and, thus, it was inadmissible with respect to the remaining charges. (*Albarran, supra*, 149 Cal.App.4th at pp. 222–223.) Albarran argued the admission of

17    The People do not challenge the trial court's conclusion that Jane's testimony was inadmissible because it was irrelevant. Thus, we are not called upon to review the correctness of the court's evidentiary ruling and express no opinion on this point.

irrelevant prejudicial evidence rendered the trial on the non-gang-related charges fundamentally unfair in violation of due process. (*Ibid.*) The appellate court agreed, finding that a "panoply of incriminating [and inflammatory] gang evidence," which "had no bearing on the underlying charges," was presented at trial. (*Id.* at p. 227; see *id.* at pp. 227–228.) It concluded that the jury's exposure to this evidence, which was belatedly determined to be irrelevant and inadmissible, "could only have served to cloud their resolution of the issues." (*Id.* at p. 230.) Albarran's case, the court held, "presents one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*Id.* at p. 232.)

Like *Albarran*, here, the prosecutor presented "a panoply" of evidence that was belatedly found to be inadmissible. (*Albarran*, *supra*, 149 Cal.App.4th at p. 227.) And, also like *Albarran*, the inadmissible evidence at issue here was prejudicial and inflammatory, as it portrayed an unrebutted narrative that Lopez, on trial for sex offenses against a minor, groomed and manipulated a naïve and inexperienced Jane. And more, unlike even the circumstances presented in *Albarran*, the erroneous admission of prejudicial evidence here was compounded by additional factors.

To summarize, over the course of four days, and over defense objection, Jane was allowed to offer pervasive prejudicial testimony regarding how Lopez's actions made her feel.[18] As the trial court suggested, this testimony

---

[18] We cannot overstate the prevalence of Jane's testimony on this point. Again, the testimony took place over the course of four days and included testimony regarding Jane's communications with Lopez, which included some 8,000 text messages. To illustrate the extensiveness of Jane's inadmissible testimony, we cite here (as examples and not exhaustively) the pages of the reporter's transcript on which arguably inadmissible excerpts of Jane's testimony can be found:  4 RT 821, 822–823, 826, 832, 838–839, 841, 843,

portrayed Jane's persona as being "opposite" of what was shown in the defense's proffered rebuttal evidence and suggested she was "some 17-year-old little girl who had never had any experience with older men."  After the jury heard this testimony, the trial court conceded it was all irrelevant, and the court should have excluded it at the outset.  Then, because the court decided it would strike the inadmissible testimony and issue a curative instruction, it prevented the defense from offering readily available evidence the court acknowledged would have provided the jury with a very different impression of Jane than had been presented during the days-worth of direct examination.

This presentation of extensive inadmissible evidence, combined with the exclusion of defense evidence that would have rebutted the inadmissible testimony, presents an even more compelling example of a due process violation than that presented in *Albarran*.  Thus, we find the evidentiary error here denied Lopez of his due process right to a fair trial.

But this is not the end of our inquiry.  Constitutional errors in admitting or excluding evidence are both subject to harmless error review. (*People v. Mil* (2012) 53 Cal.4th 400, 412.)  "Federal constitutional errors subject to harmless error review are reviewed under *Chapman*[*v. California* (1967) 386 U.S. 18 (*Chapman*)], which requires us to reverse the conviction unless the People can demonstrate that the error was harmless beyond a reasonable doubt."  (*People v. Reese* (2017) 2 Cal.5th 660, 671.)  "To determine

_____

844, 847, 849, 852–853, 855, 865; 5 RT 921–922, 937–938, 944–945, 952, 959, 962, 967, 969–971, 973–974, 976, 992–993, 997, 1000, 2003, 1006–1008, 1012–1016; 6 RT 1106, 1110, 1112, 1116–1117, 1146–1147, 1149–1151, 1154–1155, 1160–1161, 1163, 1172,  1177–1178, 1183–1184; 7 RT 1214, 1227–1230, 1232–1233, 1235, 1237, 1242, 1244–1246, 1249, 1252–1253, 1268, 1276.

whether the People have carried their burden, we examine the entire record and must reverse if there is a reasonable possibility that the error contributed to the verdict." (*Ibid.* [cleaned up].)

Here, because the People believe there has been no constitutional error, they do not address the *Chapman* standard. Nevertheless, we have considered the People's arguments that the trial court's error was harmless in light of four factors: (1) the trial court's jury instructions, (2) the jury's acquittal of Lopez on most charges, (3) other evidence admitted at trial, and (4) the weight of the evidence of Lopez's guilt. We address each of these arguments in turn and find them insufficient to carry the People's burden of showing there is no reasonable possibility the error contributed to the verdict.

We recognize the trial court's efforts to remedy its evidentiary error by purporting to strike Jane's inadmissible direct testimony and attempting to instruct the jury to disregard it. But it did so by amorphously instructing the jury to disregard "that portion of [Jane's] testimony over the last four days as to her feelings or how she felt as a result of texts or of the Defendant's statements or the Defendant's actions" and "that portion of [Jane's] testimony with regard to interpretation or understanding as to the meaning of texts in whole or in part -- texts she sent or texts she received." The court's instruction had no temporal connection to any discrete portion of Jane's testimony that was deemed inadmissible, and it did not provide the jury with any guidance for pinpointing what portions of Jane's testimony fell within the strike zone. The court simply left it to the jury to interpret what portions of Jane's testimony were to be disregarded pursuant to the instruction and further relied on the jury to be able to recall each inadmissible excerpt from days-worth of testimony. Even thoughtfully phrased limiting instructions may be insufficient to mitigate the harm resulting from prejudicial evidence.

24

(See *People v. Guerrero* (1976) 16 Cal.3d 719, 730 ["No limiting instruction, however thoughtfully phrased or often repeated, could erase from the jurors' minds the [prejudicial evidence]."].)  A limiting instruction becomes particularly ineffective where, like here, the trial court's instruction is confusing at best.

The ineffectiveness of the trial court's limiting instruction in Lopez's case is illustrated by the fact that even the People, both at trial and on appeal, have referred to arguably stricken portions of Jane's testimony.  For example, at trial, the prosecutor began his closing argument by asserting Jane viewed Lopez as "first a teacher who saw something in her"; then "a mentor," "an uncle figure," and a "coach"; then "someone that she thought really believed in [her]"; and, finally, someone she wanted "to be a lover." The prosecutor also commented on how Lopez's texts "made [Jane] feel better," and made her "feel[ ] closer and closer and closer to him."  The prosecutor further argued that Jane "is really still hurt by Mr. Lopez, but also has a lot of really good memories with him . . . [and] still in her heart has these really powerful moments with her."  The prosecutor also asserted, "Mr. Lopez occupied a lot of spaces in [Jane's] life [and] [w]hat [he] did, the way he used [Jane], was wrong."  The prosecutor further argued Jane thought she was in love with Lopez and "still feels very strong for Mr. Lopez because naturally she's going to have great memories with him. . . .  And that must be so painful for her to come in here and still be upset with him over all of what he did, but also have these really powerful strong emotions with him."  Similarly, in the respondent's brief here, the People make multiple references to arguably stricken testimony, citing to portions of the record where Jane testified Lopez "seemed like he was there for [her]," gave reasons for why she thought the two grew close, and explained that texting with

25

Lopez made her "feel sexy." Where even trained lawyers representing the People have demonstrated confusion about which portions of Jane's testimony had been stricken under the trial court's limiting instruction, we cannot assume laypersons in the jury correctly or successfully applied the instruction to disregard all of Jane's irrelevant and inadmissible testimony.

As to the jury's verdicts and the weight of the evidence, clearly the jury found this to be a close case. After listening to the evidence and attempting to apply the trial court's instructions, the jury acquitted Lopez of 18 charges, hung on five charges, and convicted Lopez of only two charges. (See *People v. Epps* (1981) 122 Cal.App.3d 691, 698 [admission of evidence deemed prejudicial where "the verdict's reflect[ed] the jury's selective belief in the evidence"].) In addition, we have found here that the evidence was insufficient to support one of the two convictions.

Lastly, although the jury heard other evidence suggesting Jane was attracted to older men, these isolated references in the record, alone, were insufficient to mitigate the prejudice flowing from days-worth of inadmissible prejudicial testimony.

Under the unique circumstances of this case, we cannot find the People have met their burden of showing "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, 386 U.S. at p. 24.)[19]

---

[19] For the same reasons we find the error was not harmless under the *Chapman* standard, we also would find the error was not harmless under the *Watson* standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [requiring defendant to demonstrate "it is reasonably probable that a result more favorable to [the defendant] would have been reached in the absence of the error"].)

*Child Molestation*

Lastly, Lopez asserts the evidence was insufficient to support his conviction for misdemeanor child molestation because it did not show he was motivated by an unnatural or abnormal sexual interest in Jane. We reject this claim.

When considering a challenge to the sufficiency of the evidence to support a conviction, we view the record in the light most favorable to the judgment to determine whether it contains substantial evidence so that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Collins* (2025) 17 Cal.5th 293, 307; *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

Section 647.6, subdivision (a)(1), makes it a misdemeanor to "annoy[ ] or molest[ ] any child under 18 years of age." To convict a defendant under this section, the prosecution must establish four elements: "(1) the defendant engaged in conduct directed at a child; (2) a normal person, without hesitation, would have been disturbed, irritated, offended, or injured by the defendant's conduct; (3) the defendant's conduct was motivated by an unnatural or abnormal sexual interest in the child; and (4) the child was under the age of 18 years at the time of the conduct." (*People v. Clotfelter* (2021) 65 Cal.App.5th 30, 50.) This offense is unique because, while generally requiring only the intent to do the prohibited act, it adds "the 'mental state element' of motivation by an unnatural or abnormal sexual interest." (*Ruelas v. Superior Court* (2015) 235 Cal.App.4th 374, 379 (*Ruelas*).)[20] The motivation for the defendant's actions must be an

---

[20] The offense of molestation under section 647.6 is what historically has been referred to as a "general intent" crime. (*Ruelas, supra,* 235 Cal.App.4th

unnatural or abnormal sexual interest "in children in general or a specific child." (*People v. Phillips* (2010) 188 Cal.App.4th 1383, 1396.)

Lopez argues the only evidence presented at trial on the issue of whether he was motivated by an unnatural or abnormal sexual interest was testimony from Clipson, the defense psychologist. While Clipson opined it is biologically and physiologically normal for an adult heterosexual male to find an older adolescent sexually attractive, Clipson also testified that the distinction between adult and adolescent is "a social construct" that is "defined more by legal criteria than it is biological criteria." Lopez has pointed to nothing in the language of section 647.6, subdivision (a)(1), or any

---

at p. 379.) " 'A crime is characterized as a "general intent" crime when the required mental state entails only an intent to do the act that causes the harm; a crime is characterized as a "specific intent" crime when the required mental state entails an intent to cause the resulting harm.' " (*People v. Atkins* (2001) 25 Cal.4th 76, 86.) In February 2026, the Judicial Council approved modifications to the criminal jury instructions regarding intent and mental state. (Judicial Council of Cal., Advisory Com. on Criminal Jury Instructions Rep., Jury Instructions: Criminal Jury Instructions (Feb. 20, 2026) pp. 2–3.) Pursuant to the modifications, CALCRIM No. 250 (Union of Act and Intent: General Intent) and No. 251 (Union of Act and Intent: Specific Intent or Mental State) have been revoked and No. 252 (Union of Act and Intent: General and Specific Intent Together) has been modified to eliminate references to the terms "general intent" and "specific intent." (Judicial Council of Cal., Advisory Com. on Criminal Jury Instructions Rep., Jury Instructions: Criminal Jury Instructions (Feb. 20, 2026) pp. 2–3, 18–26.) As modified, CALCRIM No. 252 instructs that when a crime does not require a specific mental state it necessitates only a showing that an individual intentionally committed the act prohibited by the statute, while a crime requiring one or more specific mental states necessitates a showing both that an individual intentionally committed the prohibited act and that the individual did so with the specific mental state required by the statute. (Judicial Council of Cal., Advisory Com. on Criminal Jury Instructions Rep., Jury Instructions: Criminal Jury Instructions (Feb. 20, 2026) pp. 23–26.)

cases interpreting the section, that limits the statutory definition of "unnatural" or "abnormal" to strictly biological criteria, or that excludes considerations of pervasive social mores.[21]

The evidence presented at trial showed Lopez's sexual interest in Jane was unnatural and abnormal under social mores. Jane testified she knew her relationship with Lopez was not socially acceptable. In addition, Lopez's repeated requests that Jane limit the flirtatious behavior and statements until Jane was 18 years old showed he also knew a sexual relationship between them before she reached adulthood was inappropriate. Objective observers also found the relationship disturbing. A classmate reported their conduct to another teacher because he found it to be inappropriate. And Jane's friends grew concerned when they realized a 54-year-old teacher was picking Jane up from the beach party.

This evidence is sufficient for a reasonable jury to find beyond a reasonable doubt that Lopez's sexual interest in Jane was unnatural and abnormal for purposes of section 647.6, subdivision (a)(1). They were also free to reject Clipson's testimony that the attraction was biologically normal. Because we reject Lopez's sufficiency of the evidence claim as to his

---

[21]    On this charge, the trial court gave the jury the following special instruction: "Behavior is unnatural if it is not in accordance with natural human feeling or emotion and inconsistent with what is reasonable or expected. [¶] Behavior is abnormal if it causes pain or distress at the time the behavior is exhibited. It is behavior you would not expect from a reasonable person under the same or similar circumstances. It is any behavior that deviates from normal behavior or does not follow conventional or standard social and moral rules." Lopez has not challenged the propriety of this instruction and, thus, has forfeited any such challenge. (*Battle, supra*, 198 Cal.App.4th at p. 76.)

conviction of child molestation under section 647.6, subdivision (a)(1), the People may retry him on this charge on remand.

## DISPOSITION

The judgment is reversed and the matter is remanded.


DO, Acting P. J.

WE CONCUR:


CASTILLO, J.


RUBIN, J.